UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| Viking Global Equities LP, Viking Global Equities II LP, and VGE III Portfolio Ltd., | No._____ |
| Plaintiffs, | (Jury Trial Demanded) |
| -against- | |
| Porsche Automobil Holdings SE, f/k/a/ Dr. Ing. h.c. F. Porsche AG, | **COMPLAINT** |
| Defendant. | |

Plaintiffs Viking Global Equities LP, Viking Global Equities II LP, and VGE III

Portfolio Ltd. ("Viking" or "Plaintiffs"), by and through their undersigned counsel, bring this

action alleging fraud and violations of Section 10(b) of the Securities Exchange Act of 1934 (the

"Exchange Act"). The following allegations are based on Plaintiffs' personal knowledge as to

themselves and their own acts and are otherwise based on information and belief supported by

their counsel's investigation. Plaintiffs' counsel's investigation has included, among other

things, a review of press releases, financial disclosures, and public statements made by

Volkswagen AG ("VW") and Porsche Automobil Holding SE, f/k/a/ Dr. Ing. h.c. F. Porsche AG

("Porsche" or "Defendant"); security analysts' reports; news and financial press reports; and

other sources and data detailed below. Plaintiffs believe that a reasonable opportunity for

discovery will likely reveal substantial additional evidentiary support for the allegations set forth

below.

## NATURE OF THE ACTION

1.      This is an action for the recovery of at least $390 million in damages that Viking

lost as the direct result of Defendant's illegal scheme to secretly take over VW by cornering the

market for VW's ordinary/voting shares ("VW Shares") through fraud and market manipulation.

The scheme culminated in what the New York Times described as "a short squeeze of historic proportions." This massive fraud caused investors, including Viking, to lose an estimated $38.1 billion in less than one week of trading in late October 2008, while Porsche cleared over $7.6 billion in trading profits during the same week.

2.      During the period of Porsche's scheme, Porsche was the largest shareholder of VW Shares, publicly stating that it owned more than 30% of the VW Shares by April 2007. The second largest shareholder was the German region of Lower Saxony, which for political reasons held slightly more than 20% of the VW Shares. Based on fundamental analysis of VW's profitability and operations, Viking believed that the VW Shares were overpriced relative to the equity value of VW as an enterprise, and that the VW Share price would eventually return to alignment with the actual enterprise value. Viking's conviction was grounded in reliance on Porsche's repeated public assurances between at least March 2008 through October 2008 that it did not currently own, and did not intend to acquire, a controlling interest in VW, meaning at least 75% of the VW Shares. Relying upon these statements, between July and October 2008 Viking entered into short positions on VW Shares by borrowing VW Shares under contracts requiring return of the VW Shares during the second half of 2009, and then selling these VW Shares into the market in 2008 with the belief that when it repurchased the VW Shares in 2009 it would pay less for the VW Shares then what it had been able to sell them for in 2008.

3.      Unlike the potential liability on buying shares in a corporation, which is limited to the price paid for the shares, the downside risk on a short position is, at least in theory, infinite because the share price could rise to any level a buyer is willing to pay. Viking therefore understood that if Porsche were to ever attempt to take control of VW by purchasing the remainder of the available VW Shares in the market, it could suffer potentially cataclysmic

losses in an ensuing "short squeeze." Viking entered its short positions in direct reliance upon Porsche's express denial that it would attempt to acquire control of VW during the relevant time period, as well as the integrity of the market and market price of VW Shares. Viking would not have entered its short positions in VW Shares if Porsche had stated that it was planning to attempt to acquire control of VW in the relevant time period.

4.     However, unbeknownst to Viking or the market, at least as early as March 2008 Porsche was taking steps to corner the market in VW Shares as part of an effort to secretly take control of VW. Through careful market manipulation and false statements, Porsche convinced investors to believe that the VW Shares were overvalued, inducing them to enter into short sales of VW Shares. These short sales in turn allowed Porsche to acquire more and more VW Shares, since unbeknownst to the short sellers, Porsche was directly and indirectly acquiring borrowed VW Shares that the short sellers were selling in the market as part of its secret scheme to take control of VW. Because Viking was unaware that Porsche had a secret scheme to take control of VW by acquiring control of more than 75% of the VW Shares, and based upon its reliance upon Porsche's statements and the integrity of the market, Viking believed that there would be sufficient VW Shares available in the market to cover its short positions. However, due to Porsche's fraud, calculated deception and manipulation, Viking and the market as a whole dramatically underestimated the supply of VW Shares outside of Porsche's control.

5.     On October 26, 2008, Porsche sprang its trap on the market, revealing it planned to take over VW and had amassed a previously undisclosed position in VW Shares, either directly or through options-contract counterparties, totaling 74% of the VW Shares outstanding. The announcement stunned the market, setting off a frenzied race for VW Shares. VW short sellers realized that with Porsche locking up so much of the float, there would not be nearly

enough VW Shares available to meet the demand from short sellers needing to cover their positions. Due to this "massive short squeeze" (Reuters), the price of VW Shares skyrocketed to unprecedented levels, with no guarantee of an end in sight, causing short sellers to lose an estimated $38.1 billion in less than one week, and Viking itself to lose at least $390 million in a two-day period. The panic did not subside until Porsche, under significant pressure, eased its stranglehold on supply by selling VW Shares and/or settling options on VW Shares, and in the process extracting billions of dollars in profits from the short sellers who were at its mercy.

## PARTIES

**A.    The Plaintiffs**

6.      Plaintiffs Viking Global Equities LP and Viking Global Equities II LP are both limited partnerships established under the laws of Delaware. Plaintiff VGE III Portfolio Ltd. is a limited company established under the laws of the Cayman Islands with its registered address at Morgan Stanley Fund Services (Cayman) Cricket Sq, Hutchins Dr, P.O. Box 2681, Grand Cayman KY1-1111. Plaintiffs are each managed by Viking Global Investors LP ("Viking Global Investors"), a limited partnership established under the laws of Delaware with offices located at 280 Park Avenue, New York, NY 10017 and 55 Railroad Avenue, Greenwich, CT 06830. At all relevant times, the investment managers responsible for Plaintiffs' investment decisions related to VW were located in Viking Global Investors' New York and/or Connecticut offices.

**B.    The Defendant**

7.      Defendant Porsche Automobil Holdings SE ("Porsche") became a European stock corporation (Societas Europaea) on November 13, 2007. Prior to that time, it was known as Dr. Ing. h.c. F. Porsche Aktiengesellschaft. It is headquartered in Stuttgart – Zuffenhausen, Germany. At all relevant times, Porsche was the largest shareholder in VW.

## JURISDICTION

### A.     Subject-Matter Jurisdiction

8.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331 and under § 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C.

§ 78aa, because Plaintiffs' claims arise under § 10(b) of the Exchange Act.

9.      This Court has supplemental jurisdiction over Plaintiffs' state-law fraud claims

pursuant to 28 U.S.C. § 1367.

### B.     Personal Jurisdiction

10.     This Court has personal jurisdiction over Defendant pursuant to Fed. R. Civ. P.

4(k)(1) because Porsche is subject to the jurisdiction of the state of New York pursuant to NY

CPLR §§ 301 and 302(a)(3).  Alternatively, this Court has personal jurisdiction over Porsche

pursuant to Fed. R. Civ. P. 4(k)(2), which extends personal jurisdiction to the limit of the Fifth

Amendment's Due Process Clause.

11.     This Court also has personal jurisdiction over Porsche under § 27 of the Exchange

Act, 15 U.S.C. § 78aa, which extends personal jurisdiction to the limit of the Fifth Amendment's

Due Process Clause.

### 1.     New York CPLR § 301 – General jurisdiction

12.     Section 301 of New York's CPLR grants state courts personal jurisdiction over

any person physically present within the state, or over a person or entity "doing business" in the

state.  If a subsidiary is subject to general jurisdiction in New York, its parent is also subject to

general jurisdiction in New York where the activities of the parent show a disregard for the

separate corporate existence of the subsidiary.  Porsche Cars North America, Inc. ("PCNA") is a

Delaware Corporation currently registered to do business in New York.[1]  According to Porsche's website, PCNA "is a wholly owned, indirect subsidiary of Dr. Ing. h.c. F. Porsche AG...."[2]  The structure and culture of the Porsche corporate family renders PCNA a mere department and agent of Porsche.  PCNA "provide[s] Porsche vehicles, parts, service, marketing and training for its 202 dealers," and  has exclusive right to import Porsche manufactured vehicles for sale in the U.S.[3]  Porsche appoints the senior managers of PCNA, who rotate throughout other divisions of the corporate family.  *See* Porsche press release, *Detlev von Platen becomes new President and CEO of Porsche Cars North America,* February 22, 2008. ("Dr. Ing. h.c. F. Porsche AG, Stuttgart, Germany, names two new executive managers in its two most important markets.").[4] As such, Porsche is subject to personal jurisdiction in New York under CPLR § 301 and, by extension, under Fed. R. Civ. P. 4(k)(1).  Multiple members of the executive and supervisory boards of  Porsche have served on the boards of the regional subsidiaries since at least 2004, according to published annual reports.  Wendelin Wiedeking, Chief Executive Officer of Porsche at all relevant times, is listed as Chairman of PCNA from 2004 – 2007 and a member of the PCNA board from 2004 through July 2009.  Holger Haerter, Chief Financial Officer of Porsche at all relevant times, served as a member of the PCNA board over the same period.

   2.   **New York CPLR § 302(a)(3) - Long-Arm Jurisdiction**

   13.     Under CPLR § 302(a)(3), New York's long-arm statute, a New York court may exercise jurisdiction over a non-domiciliary when it commits a tortious act outside of New York if the situs of the injury from that tortious act is located within New York.  Porsche transmitted

---

[1]  *See* New York State Corporation/Business Entity Database: http://www.dos.state.ny.us/

[2]  *See* http://www.porsche.com/usa/aboutporsche/porschecarsnorthamerica/n432/

[3]  *Id.*

[4] http://www.porsche.com/usa/aboutporsche/pressreleases/pag/archive2008/quarter1/?pool =international-de&id=2008-02-22

fraudulent statements into New York, and Viking's investment analysts and managers, located in New York, relied upon those fraudulent statements. These fraudulent statements included false information communicated on or about September 1, 2008 by Frank Gaube ("Gaube"), Porsche's head of investor relations, directly to Viking Global Investors' investment analyst, Andrew Immerman, who was located in New York at the time. Based upon this reliance, Viking entered into and covered short positions in VW Shares in New York, making New York the location where Porsche's tortious actions had their first effect on Viking.

14.     Porsche knew or should have known that its tortious behavior would have consequences in the state of New York. Defendant was well aware that New York City functions as one of the main locations for trading activities, including short selling, and that a number of investment management firms and banks are either based in New York City or maintain substantial offices in New York City. In fact, representatives of Porsche regularly spoke by telephone to investment management firms that it knew were located in New York City regarding its acquisition of VW Shares, and also directed emails and other communications to those same offices, including to the New York offices of Viking Global Investors. Porsche derives substantial revenue from interstate or international commerce. From 2007 through 2008, Porsche sold more than 98,000 vehicles throughout the world and reported total earnings of more than $8.6 billion. As discussed in more detail below, Porsche also engaged in a persistent course of conduct in New York through its regular and persistent communications with investors and investment management firms located in New York. As a result, New York courts have personal jurisdiction over Porsche under CPLR § 302(a)(3), and, by extension, this Court has jurisdiction under Fed. R. Civ. P. 4(k)(1).

### 3.      Porsche's Contacts with New York State and the United States

15.      The following facts demonstrate that Defendant had sufficient minimum contacts with New York and the United States to render it amenable to this suit and fulfill the Due Process requirements of both the 5th and 14th Amendments.  In connection with the acts and conduct alleged below, Defendant, directly and indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, interstate wire and telephone communications.

16.      As more fully described below, Defendant's acts and conduct occurred in New York and the United States, including the making of material false statements and omissions in the United States that were directed at investors and investment managers in New York and the United States.  These acts and conduct had substantial, direct and foreseeable effects on Plaintiffs and other persons in New York and the United States.

17.      Porsche launched its effort to corner the market in VW Shares by purchasing a large block of VW Shares in the United States from Brandes Investment Partners LLC, an American institutional investor in San Diego, California.

18.      Porsche maintained regular and substantial contacts and communications with New York and the United States, including regularly distributed press releases, ad hoc announcements, and other significant company news or documents by electronic mail, in English, to an undisclosed distribution list which, at relevant times, included at least 30 recipients in the United States.  The U.S. recipients included hedge funds, investment funds, and pension funds.  Employees working in Viking Global Investors' New York office received this information directly from Porsche.

19.      Over the course of 2007 and 2008, Porsche purposefully transmitted numerous public announcements, press releases, and other reports regarding Porsche's acquisition of VW

Shares to New York and the United States using the means and instrumentalities of interstate commerce, including, but not limited to, interstate wire and telephone communications. Examples of these communications during the relevant time period include:

a. On December 14, 2007, Gaube emailed Porsche's interim financial information, which contained a discussion of Porsche's "strategic/industrial" partnership with VW.

b. On March 3, 2008, Katharina Dippell ("Dippell") of Porsche emailed a press release announcing the decision of the Supervisory Board of Porsche to authorize the increase of Porsche's stake in VW to more than 50%. Porsche directly transmitted an English-language translation of this communication to one or more employees working in Viking Global Investors' New York offices.

c. On March 10, 2008, Dippell emailed a press release in which Porsche stated that it would not seek to raise its stake in VW to 75%. Porsche directly transmitted this communication in English to one or more employees working in Viking Global Investors' New York offices.

d. On March 14, 2008, Dippell emailed a press release in which Porsche said it would seek to amend VW's articles of association to reflect the judgment of the European Court of Justice regarding the VW Law. Porsche directly transmitted an English-language translation of this communication in English to one or more employees working in Viking Global Investors' New York offices.

e. On March 19, 2008, Dippell emailed Porsche's Half-Yearly Financial Report, dated March 4, 2008, which discussed Porsche's investments in VW, the VW Law, and Porsche's intentions going forward, stating that once "antitrust clearance has been given, Porsche

SE will acquire the majority shareholding in Volkswagen, with a view creating one of the world's most innovative and efficient automotive alliances...." Porsche directly transmitted an English-language translation of this communication to one or more employees working in Viking Global Investors' New York offices.

      f.      On April 18, 2008, Dippell emailed an English translation of an interview, published in the April 17, 2008 edition of Stern Magazine, of Wolfgang Porsche and Ferdinand Piëch, members of the two families that control much of Porsche and VW, in which they discussed Porsche's investment in VW. Porsche directly transmitted an English-language translation of this communication to one or more employees working in Viking Global Investors' New York offices.

      g.      On June 18, 2008, Sylvia Stadelmann ("Stadelmann") of Porsche emailed Porsche's interim financial information, which discussed Porsche's investment in VW, the VW Law, and Porsche's intentions with respect to VW. Porsche directly transmitted an English-language translation of this communication to one or more employees working in Viking Global Investors' New York offices.

      h.      On October 27, 2008, Gaube emailed the October 26, 2008 press release in which Porsche finally revealed its intention to acquire 75% of VW Shares and to seek a "domination agreement" with VW, which under German law would allow Porsche to exercise outright control over VW and its profits. The announcement lead to the short squeeze in VW Shares.

      20.      Porsche also distributed information regarding its investments in VW Shares by telephone with investors and investment managers in the United States. On or about September 1, 2008, Gaube spoke by phone with Viking Global Investors' Andrew Immerman, who was in

New York at the time of the call, about Porsche's intentions with regards to VW. During the call, Gaube laid out various reasons why Porsche would not be able to acquire a controlling stake and, on that basis, told Immerman in conclusion that "[i]t is unrealistic [for Porsche] to go to 75%." Gaube knew that Immerman was in New York at the time of the phone call.

21.     Porsche also distributed information regarding its investments in VW Shares by telephone with investors and investment managers in the United States of similarly situated investment funds that have filed suit in the related case *Elliot Associates, L.P. v. Porsche Automobil Holdings SE*, Case No. 10 Civ. 0532 (S.D.N.Y. January 25, 2010) (HB) ("*Elliot Associates L.P., et al.*"), as follows:

a.     On May 5, 2008, Gaube spoke by telephone to Keith Goodman, an analyst at Glenhill Capital Management LLC in New York, NY, who was in New York and was responsible for advising certain plaintiffs in *Elliot Associates L.P., et al.* regarding their investment decisions in VW. Gaube knew that Goodman was in New York at the time of the phone call. During that telephone call, Gaube told Goodman that Porsche wanted to attain more than 50% ownership in VW and that in furtherance of that objective, it had used options to lock up an additional 20% of the VW Shares in addition to the approximately 31% of the Shares that it already owned outright. Gaube also told Goodman that Porsche had no intention of increasing its stake in VW to 75%.

b.     On October 20, 2008, Gaube spoke by telephone with David Einhorn, President of Greenlight Capital, Inc. in New York, New York, who was in New York and had final authority to make trading decisions for certain plaintiffs in *Elliot Associates L.P., et al.* regarding their investment decisions in VW. Gaube knew that Einhorn was in New York at the time of the phone call. During that telephone call, Gaube told Einhorn that Porsche was not

going to 75%, that "going to 75% is not on the agenda," and specifically denied controlling

almost all the float of VW Shares.  Gaube also expressly disavowed the speculation of one

analyst, Max Warburton of Alliance Bernstein, who, on October 17, 2008, had offered in the

form of a Bernstein Research analyst report a seemingly speculative argument that Porsche

might be accumulating additional control of VW Shares.  Gaube claimed to have "talked to a

number of investors and analysts" to refute Warburton's theory, which Gaube called "complete

bull****."

        c.      On or about October 20, 2008, Gaube spoke by telephone with Neeraj

Chandra, an analyst at Tiger Global Management, LLC in New York, New York, who was in

New York and was responsible for advising certain plaintiffs in *Elliot Associates L.P., et al.*

regarding their investment decisions in VW.  Gaube knew that Chandra was in New York at the

time of the phone call.  During that telephone call, Gaube told Chandra that Porsche had options

that would allow it to take its stake in VW Shares to 50-55%, but told Chandra that the

accumulation would stop there.

        d.      On or about October 20, 2008, Gaube spoke by telephone with Larry

Robbins, Chief Executive Officer of Glenview Capital Management, LLC in New York, New

York, who was in New York and had final authority to make trading decisions for certain

plaintiffs in *Elliot Associates L.P., et al.* regarding their investment decisions in VW.  Gaube

knew that Robbins was in New York at the time of the phone call.  During that telephone call,

Gaube told Robbins that Porsche did not intend to go much above 51% ownership in VW and

did not intend to go to 75%.

      22.      Porsche also made other statements in the United States related to its VW

investments.  On January 9, 2007, Wendelin Wiedeking (the President and Chief Executive

Officer of Porsche during the relevant time period) met with reporters at the North American International Auto Show in Detroit. Of the sixty-nine questions posed to Wiedeking during the hour-long group interview, sixty-four were related to VW. At that same auto show in Detroit, Wiedeking participated in an interview with *Business Week's* David Kiley in which Kiley asked Wiedeking why Porsche was not paying a premium for control of VW. Wiedeking responded, "Why should I pay a premium? No. I don't see any reason for this, 29% is enough for Porsche. We won't acquire more than 50%."[5]

23.     Porsche maintained an English language website with an archive of English language press releases at all relevant times, which it used to target its misrepresentations at investors in the United States. While Porsche did not translate all of its press releases into English, it did translate each of them that related to Porsche's intentions and holdings with respect to VW Shares. Furthermore, U.S. investors that visit www.porsche.com in search of investor relations information are directed to an English-language investor relations page on www.porsche-se.com.[6]

24.     Porsche also does substantial business in the United States, which is the largest market for its automobiles, through its subsidiaries, which include Porsche Cars North America, Inc., Porsche Liquidity LLC, Porsche Capital LLC, and Porsche Enterprises Inc., all of which are Delaware corporations 100% owned by Porsche through an "indirect equity investment" and fully consolidated into Porsche financial results. In addition, Porsche Financial Services, Inc., based in Lisle, Illinois, is a wholly-owned subsidiary of Porsche Enterprises, Inc, and therefore

---

[5] *Porsche and VW: Forward Together*, Businessweek.com, January 10, 2007 (http://www.businessweek.com/autos/content/jan2007/bw20070110_159650.htm).

[6] Redirection of the user to an English translation appears to be automatic, presumably based upon the geographic location of the user as determined by IP address.

also a wholly-owned and consolidated subsidiary of the parent corporation.  Porsche's United

States subsidiaries perform substantial business activity on its behalf that, were it not for them,

Porsche would perform itself.  Three of these United States subsidiaries alone (Porsche Cars

North America, Inc., Porsche Liquidity LLC, and Porsche Capital LLC) had sales of over $1.5

billion and employed 243 individuals in the United States at the end of the 2008 fiscal year.[7]

25.     Porsche Cars North America is currently registered to do business as a foreign

corporation in the state of New York.  Porsche's control over its wholly-owned subsidiary,

PCNA, is sufficient to render PCNA the agent of the Defendant, and therefore PCNA's activities

in New York constitute minimum contacts with New York by the Defendant.

26.     Porsche is also aware that it is an international company subject to laws in

multiple jurisdictions.  On at least seven occasions, it has sought the protection of United States

laws in federal courts.  *See, e.g. Dr. Ing. H.C.F. Porsche AG v. Universal Brass, Inc.,* 1995 WL

420816 (W.D. Wash. 1995); *Dr. Ing .H.C.F. Porsche AG v. Classic Motor Carriages, Inc.,* 92

F.R.D. 781 (S.D.Fla. 1982); *Dr. Ing. H.C.F. Porsche AG v. Zim* 481 F.Supp. 1247 (N.D. Tex.

1979); *Porsche Cars North America, Inc. v. Porsche.net*, 302 F.3d 248 (4th Cir. 2002) (*Dr. Ing.

H.C.F. Porsche AG* is named co-plaintiff); *Porsche Cars North America Inc. v. AllPorsche.com*,

2000 WL 742185 (4th Cir. 2000) (*Dr. Ing. H.C.F. Porsche AG* is named co-plaintiff); *Porsche

Cars North America, Inc. v. Spencer*, 2000 WL 641209 (E.D.Cal. 2000) (*Dr. Ing. H.C.F.

Porsche AG* is named co-plaintiff); *Porsche Cars North America, Inc. v. Manny's Porshop, Inc.*,

972 F.Supp. 1128, 1129 (N.D.Ill. 1997) (*Dr. Ing. H.C.F. Porsche AG* is named co-plaintiff).

---

[7]   Sales and employment figures by region were not disclosed in the more recent
2008/2009 Porsche annual report.

**4.      Defendant's Wrongful Conduct Had Direct and Foreseeable Effects in New York and the United States**

27.      In addition to acts and conduct of Defendant's occurring in the United States, Defendant's wrongful conduct had substantial, direct and foreseeable effects in the United States and upon United States residents and domiciliaries, including Viking.  During the relevant period, dozens of U.S. institutional investors and funds owned millions of VW Shares for the benefit of investors residing in the United States.

28.      Porsche was an experienced derivatives trader facing a mathematical problem: it sought to obtain control of 75% of the VW Shares, but more than 25% of the VW Shares were controlled by shareholders who would not or, effectively, could not sell their VW Shares to Porsche.  Porsche therefore needed short sellers to borrow VW Shares from current owners who would not or could not sell their VW Shares themselves to increase the available supply of VW Shares that Porsche could seek to control.  The success of Porsche's fraudulent scheme was dependent upon parties shorting VW Shares, and Porsche was well aware of the short positions being taken on those VW Shares in the market.  Porsche's statement on October 26, 2008 that it had become "apparent that there are by far more short positions in the market than expected…" was facetious at best.  Porsche not only knew that investors had taken extensive short positions in VW Shares, but had helped facilitate those shorts positions knowing full well that the primary victims of its scheme would be the funds taking those short positions.  Furthermore, Porsche's self-serving and purposefully false statement that its disclosure of its VW position "should give so called short sellers… the opportunity to settle their relevant positions without rush and without facing major risks" demonstrated its awareness that it had engineered a short squeeze in VW Shares.

29.     Porsche was aware that while VW Shares traded primarily on German exchanges, institutional investors in the U.S. owned a substantial percentage of VW Shares.  According to VW's own 2007 Annual Report, foreign (non-German) institutional investors held 25.6 percent of VW Shares, compared to 6.2 percent held by German institutional investors.  Porsche was also aware that VW had (and still has) two sponsored American Depositary Receipt ("ADR") programs, representing ordinary and preference shares that are backed by J.P. Morgan and trade in the U.S. on the over-the-counter market.  Most, if not all, of the VW ADRs were and are held by American investors.

30.     Defendant knew that hedge funds and the managers who make their investment decisions are concentrated in a small number of locations, with the large majority of investment managers based in the United States, and particularly in New York, New York.  Therefore, Defendant (1) needed to affect investment decisions made in New York and the United States to achieve its scheme; and (2) knew that New York and U.S. based investment managers would rely, in New York and in the U.S., on Defendant's fraudulent statements and omissions.  Defendant also knew that the same fraudulent statements and omissions would be disseminated throughout and absorbed by the market at large, and that the funds that were advised by U.S. investment managers would be the primary victims of Porsche's fraud and manipulation.

31.     Viking's investment decisions relating to its VW investments and the ultimate decision-making responsibility for those investments was vested in Viking Global Investors, a U.S. based entity that managed Viking's VW investments entirely within the United States.  During the relevant period, Viking also had a significant percentage of U.S. investors.   Plaintiffs include three funds, two of which are U.S. entities, and one of which is incorporated in the Cayman Islands.

32.     Porsche also deliberately sought access to the American capital markets, and purposefully availed itself of the privilege of conducting activities in the American securities market through its sponsorship of an American Depositary Share ("ADS") program, which is backed by Citibank, N.A. and The Bank of New York Mellon.  An ADR registration for Porsche's ADS is on file with the SEC, and under SEC rules Porsche is required to publish English-language versions of financial disclosures provided to its security holders.  Porsche knew that United States investors would have access to and reasonably rely upon this information.  Most, if not all, of the Porsche ADS were and are held by American investors.

## VENUE

33.     Venue is proper in this District pursuant to 28 U.S.C. 1391(d), because Porsche is an alien.  Venue is also proper under 15 U.S.C. § 78aa.  Venue is also proper because two related cases are pending in this District against the same Defendant based upon the same operative facts and circumstances alleged here.  *See Elliot Associates, L.P. v. Porsche Automobil Holding SE,* Case No. 10 Civ. 0532 (S.D.N.Y. January 25, 2010) (HB) ; *Black Diamond Offshore Ltd. v. Porsche Automobil Holding SE,* Case No. 10 Civ. 04155 (HB) (filed May 20, 2010).

## FACTUAL BACKGROUND

**C.     Porsche Enters the Market for VW**

**1.     Porsche: The Hedge Fund that Makes Sports Cars on the Side**

34.     Porsche is well known in financial circles as an experienced and aggressive investor in derivatives, particularly under the direction of Wiedeking and Haerter.  According to Porsche representatives, Haerter is a specialist in the derivatives markets and in the mathematics of options and other derivatives.  In 2002, Haerter radically overhauled Porsche's treasury operations and began focusing his efforts on using the capital markets to improve Porsche's profits.  By as early as 2003, financial commentators and automotive industry insiders were

referring to Porsche as a hedge fund that makes sports cars on the side.  By the close of the fiscal year ending July 31, 2008, Wiedeking and Haerter's capital markets strategy was so successful that an astonishing 88% ($11.8 billion) of Porsche's total profits of $13.4 billion were generated from trading derivatives, and only 12% ($1.6 billion) from actually selling cars.  Porsche's profits from derivatives trading that year actually exceeded its gross revenues from selling cars. As part of its foray into the world of derivatives trading, Wiedeking and Haerter masterminded a complex scheme based on fraud and manipulation of the market through which Porsche could attempt to take control of VW.  This scheme, which increased Porsche's trading profits by over $7.6 billion in just one week, caused the massive short squeeze at issue in this action.

> **2.    Volkswagen: The Target**

35.    VW is headquartered in Wolfsburg, Lower Saxony, Germany, and is one of the world's largest automobile manufacturers and the largest carmaker in Europe.  It is eighty times larger than Porsche as measured by number of vehicles sold in 2008/2009 .  In 2009, VW produced over 6.3 million vehicles, corresponding to roughly an 11% share of the world passenger car market.

36.    VW is a publicly traded company, which issued VW Shares and preferred shares. VW's stock trades primarily on the Frankfurt Stock Exchange, although it is also represented on international stock exchanges, including exchanges in Switzerland, Luxembourg, and England. VW sponsors two "unlisted American Depositary Receipts" programs in New York, representing ordinary and preference shares that trade in the United States on the over-the-counter market.

> **3.    Porsche's Early Acquisition of VW Shares**

37.    Porsche gradually increased its ownership of VW shares from late 2005 through 2007, explaining its acquisition as a defensive measure intended to reduce the possibility that VW would be subject to a hostile takeover, which, according to Porsche, could threaten business

relationships between VW and Porsche.   At the time, an early version of a German statute

known as the "VW Law" was in place that limited any one VW shareholder's voting rights to

20%, regardless of the number of VW Shares held.  Speculation was widespread that the

European Court of Justice would invalidate that version of the VW Law, thus sparking concerns

of a potential hostile takeover of VW.  As the press had reported, the European Commission had

already taken the position that the VW Law violated European Union Law, and Porsche believed

that a hostile takeover attempt might follow invalidation.

38.     By March 28, 2007, through the purchase of VW Shares and the exercise of

options, Porsche had acquired 30.9% of the Shares.  Because Porsche had acquired more than a

30% stake in VW, German law required Porsche to submit a full tender bid on the remaining

VW Shares.  Porsche made the mandatory bid at the lowest possible price – a price no rational

investor would accept because it was below the then-prevailing market price – and publicly

renounced any interest in taking over VW outright.  VW's board determined that the offer was

too low, and announced that it could not recommend to shareholders that they accept Porsche's

tender.

39.     As of December 31, 2007, Porsche was VW's largest shareholder with 31% of the

VW Shares.  The State of Lower Saxony held 20.1%.  VW reported that foreign institutional

investors held 26.5%, and German institutional investors held 6.2% of the remaining VW Shares.

Unbeknownst to the market or Viking, a substantial portion of the Shares held by foreign

institutional investors were held to hedge secret option contracts that Porsche held on VW

Shares.

D.    **Porsche Conspires to Secretly Acquire a Controlling Share in VW through Fraudulent Statements and Market Manipulation**

40.    To understand the full story behind Porsche's fraud, it is necessary to go back to at least February 2008, when, according to German press accounts that did not become public until more than a year later, Porsche representatives held a secret meeting in Berlin with a high-ranking officer of the State of Lower Saxony participating on behalf of Prime Minister Christian Wulff.[8]  Lower Saxony owned slightly more than 20% of the VW Shares, which, for political reasons, it would not relinquish.  At that meeting, Porsche disclosed to Lower Saxony its intention to implement a "domination agreement" with respect to VW.[9]

41.    A domination agreement under German corporate law between an acquiring firm and a target firm allows the acquiring firm to control the target firm's decisions.  Typically, a domination agreement requires the bidder to hold 75% of the voting shares of the target company.  Because of VW's articles and the then-current version of the "VW Law," Porsche needed 80% of VW's Shares to enter a domination agreement, 5% more than typically required.  Even if Porsche could only acquire control of 75% of the VW Shares, however, it could still achieve domination if (1) it was able to strike a deal for domination with Lower Saxony, or (2) the European Court of Justice abolished the "VW Law" and lowered the requirement for domination from 80% to 75%, which Porsche expected to happen.[10]  Porsche therefore set out to secretly achieve control of at least 75% ownership of the VW Shares.

---

[8]    *Geheimprotokoll: Porsche wollte schon im Februar 2008 VW beherrsche,* WirtschaftsWoche, May 8, 2010 (http://www.wiwo.de/unternehmen-maerkte/geheimprotokoll-porsche-wollte-schon-im-februar-2008-vw-beherrschen-396598/).

[9]    While this is the first known time that Porsche disclosed its scheme to a third party, Plaintiffs expect discovery to show that Porsche implemented its fraudulent scheme prior to February 2008.

[10]    On October 23, 2007, the European Court of Justice ruled that three provisions of the VW Law were incompatible with the free movement of capital assured under European law,

42.     Porsche hid its intention to attain domination of VW in two ways: (1) lying directly to the market and investors, and (2) manipulating the market by acquiring a substantial portion of the VW Shares through options contracts it entered into in 2007 and 2008.

**E.     Porsche's Outright Lies and Misstatements to the Market**

43.     Porsche repeatedly lied to the market in the months and days leading up to its October 26, 2008 surprise announcement.  It consistently denied that it was seeking to take control of VW, or that it was even seeking to approach the minimum ownership requirement necessary to do so.  These statements were false, since from at least as early as February 2008, Porsche had decided to attempt to acquire a minimum of 75% of the VW Shares.  Indeed, unbeknownst to the market for reasons detailed below, by at least as early as mid-2008, Porsche had already achieved direct or indirect control of nearly 75% of the VW Shares through outright positions and call options.  After the short squeeze, Gaube publicly admitted Porsche's intention of keeping its domination intention secret, telling the *Wall Street Journal*, "We are a very small company buying into a very large company.  That is not something you can afford if everybody is able to read your strategy in the newspaper."[11]

---

including the special provision of the VW Law that a majority of 80% was required for resolution of the general meeting of VW as opposed to the normal 75%.  Following that judgment, a dispute among various parties (including VW, Porsche, and the State of Lower Saxony) ensued as to how that judgment should be interpreted when making changes to the Articles of Association of VW.  The dispute centered on whether each of the three provisions was in and of itself incompatible with European law, or whether it was only the combination of the three that were incompatible and therefore the 80% requirement could be left in place as long as the other provisions were revised.  As Porsche reported in an April 24, 2008 press release translated into English and available on its website, as of the 2008 annual general meeting of VW the debate was still ongoing, with Porsche taking the position that each individual provision in and of itself violated European law and that the 80% requirement for domination must be changed to 75%.

[11]   Mike Esterl and Gregory Zuckerman, *VW Shares to Be Probed After Porsche Disclosures*, Wall Street Journal, C1, October 30, 2008.

44.     Porsche's false and misleading statements include, but are not limited, to the following:

a.     On March 3, 2008, Porsche issued a press release, translated into English, titled "Porsche Supervisory Board Gives Go-ahead for Majority Stake in VW." Porsche stated: "As soon as the requisite clearances have been obtained, Porsche SE can acquire the majority of the shares in Volkswagen. Dr. Wendelin Wiedeking, Chief Executive Officer of Porsche SE, said: 'Our aim is to create one of the strongest and most innovative automobile alliances in the world, which is able to measure up to the increased international competition.' It is not planned to merge the two companies."[12] Porsche directly transmitted an English-language translation of this communication to one or more employees working in Viking Global Investors' New York offices.

b.     In its Half-Yearly Financial Report, released on March 4, 2008, which Porsche translated into English as required under SEC rules for ADR issuers, published on its website and emailed into New York, Porsche announced that once "antitrust clearance has been given, Porsche SE will acquire the majority shareholding in Volkswagen, with a view to creating one of the world's most innovative and efficient automotive alliances...."

c.     On March 10, 2008, in a corporate statement titled "Porsche denies speculations about increasing its stake in VW to 75 percent," which Porsche translated into English and emailed into the United States, Porsche stated that it would not raise its stake in VW to 75% and that, due to Lower Saxony's 20 percent stake, "the probability of acquiring [75%] from the remaining freefloat is very small indeed." Porsche directly transmitted an English-

---

[12]   http://www.porsche-se.com/pho/en/press/newsarchive2008/?pool=pho&id=2008-03-03

language translation of this communication to one or more employees working in Viking Global Investors' New York offices.

          d.      During a May 5, 2008 phone call with an investment manager in New York, Gaube stated that Porsche did not intend to increase its stake in VW to 75%.

          e.      On May 29, 2008, according to the complaint filed in *Elliot Associates L.P., et al.,* Porsche issued a corporate statement that "[d]uring the course of this year, [the] share will be increased to over 50%."

          f.      On July 28, 2008, Haerter told German daily *Frankfurter Allgemeine Zeitung,* "We're determined to cross the 51% threshold this year."

          g.      On or about September 1, 2008, Gaube told Viking Global Investors' Andrew Immerman that "[i]t is unrealistic [for Porsche] to go to 75%."

          h.      According to a September 18, 2008 report in Reuters, headlined *Porsche: Domination Agreement with VW "Not Up for Debate",* earlier that same week Haerter had stated during a meeting with Lower Saxony political officials that reaching a domination agreement was "completely unrealistic" and "not up for debate."

          i.      On October 2, 2008, Wiedeking announced at the Paris Motor Show that Porsche planned to increase its stake in VW to more than 50% before the end of the year.  As to domination, Wiedeking stated, "We do not want to rule out this possibility at the end of the day, some point in the future," but for now, he continued, domination is a "purely theoretical option."[13]

---

[13] Reuters, *AUTOSHOW-Porsche keeps option for domination of VW*, October 2, 2008 (http://in.reuters.com/article/idINWEA173620081002)

j.      In an interview published in the October 5, 2008, edition of German periodical *Frankfurter Allgemeine Sonntagszeitung,* Wiedeking stated that reaching "75% percent is out of the question today, that's for sure."

k.      During an October 20, 2008 phone call with an investment manager in New York, Gaube stated that Porsche did not intend to increase its stake in VW to 75% and that Porsche did not control almost all the float of VW Shares.  He also disavowed the speculation of one investment manager that Porsche might be accumulating additional control of VW Shares as "complete bull****."

l.      During an October 20, 2008 phone call with an investment manager in New York, Gaube stated that Porsche would stop accumulating VW Shares above 50-55%.

m.      During an October 22, 2008 phone call with an investment manager in New York, Gaube stated that Porsche did not intend to increase its stake in VW to much beyond 51%, and did not intend to increase its stake in VW to 75%.

45.     The foregoing statements were false and misleading because Porsche already had decided to take full control of VW, not acquire a mere majority, and through the exercise of options had the ability to acquire nearly 75% of the VW Shares.

46.     In a May 2009 interview with German publication Welt Online, Ferdinand Piëch, chairman of VW's Supervisory Board, a member of Porsche's Supervisory Board throughout the relevant period, and a major shareholder of both Porsche and VW, acknowledged that Porsche had decided to increase its stake in VW up to 75% by mid-year 2008.[14] Whether this is the first time that VW and Piëch learned of Porsche's secret plan remains to be determined in discovery,

---

[14]  *See Demonstration of Power in Sardinia,* Welt Online, May 13, 2009.

but Piëch's admission demonstrates that Porsche lied repeatedly to the market regarding its plans for VW Shares.

**F.    Porsche's Manipulation of the Market Through the Secret Accumulation of VW Shares through Option Contracts**

47.    In addition to its outright lies to the market, Porsche also hid its takeover plan from the market by secretly acquiring positions in VW Shares through option contracts that it entered into in 2007 and 2008, which it later used to ambush the market.

48.    While Porsche's goal was to control 75% of the VW Shares, Porsche faced a mathematical problem: more than 25% of the VW Shares were controlled by shareholders who would not or, effectively, could not sell their VW Shares to Porsche. The State of Lower Saxony controlled 20% of the VW Shares, and for political reasons refused to sell any of those VW Shares. There were also other investors, notably index funds, who were required to hold VW Shares to track indices that included VW Shares. Those investors owned more than 5% of the VW Shares. It was therefore not feasible for Porsche to acquire 75% of the VW Shares without a means of freeing up some of the VW Shares from institutional holders and other investors. Short sales became that means. While certain institutional holders of VW Shares were not willing to sell their VW Shares, they were willing to lend them to short sellers since they knew that the short sellers were obligated to repurchase and return the VW Shares to them at a future date. Porsche's scheme could only succeed if short sellers did exactly that: borrowed VW Shares and sold them, thus effectively increasing the supply of VW Shares available for purchase in the market so that Porsche could acquire more than 75% of the VW Shares.

49.    At the same time that Porsche was inducing investors to short VW Shares to increase the supply available in the market, Porsche was also buying call options on VW Shares, which in effect gave Porsche the right, but not the obligation, to purchase VW Shares at a certain

time for a certain "strike" price from its counterparties. When the price of VW Shares rose, the value of Porsche's call options also rose. To hedge their positions, Porsche's counterparties in the call options needed to purchase VW Shares. They therefore bought the VW Shares that the VW short sellers were selling short and held them as a hedge in case Porsche exercised its rights under its call options. Unbeknownst to the market and to the VW short sellers, the VW Shares that the short sellers had just sold short now sat ready for delivery to Porsche at its exercise.

50.     Two features of Porsche's option contracts made them manipulative. The first manipulative feature was that Porsche disguised physical option contracts, which require disclosure, as cash-settled options contracts that did not have the same disclosure requirements. The fact that Porsche did not actually consider these option contracts cash-settled – despite the fact that it did not disclose them – is clear from its own statements. For example, in Porsche's October 26, 2008 surprise announcement, Porsche disclosed that its options actually reflected part of its 74.1% "total" interest in VW. Further, to minimize any doubt as to whether the option contracts were cash-settled or reflected actual control, Porsche referred to the option contracts as only "so called" cash-settled options. Porsche used these option contracts to acquire control over VW Shares, and not as a means to benefit in cash from a rise in the price of the Shares. Because Porsche had the ability and intent, either through explicit contractual rights or potential side agreements with its counterparties, to convert these option contracts into actual share ownership, it should have disclosed its option contracts under applicable law. Those disclosures, which Porsche did not make, would have alerted both the market and Viking of Porsche's scheme to acquire additional VW Shares.

51.     The second manipulative feature of Porsche's option contracts was that Porsche methodically divided out the contracts to avoid counterparty disclosure requirements. Porsche

understood that the counterparties to its option contracts would purchase VW Shares to hedge their positions in the option contracts. If any one of these counterparties acquired too high of a percentage of the VW Shares, that counterparty would be legally obligated to disclose its ownership of the hedging VW Shares. The counterparty's disclosure would alert the market that someone had entered into a large derivative position on VW Shares. The market would then be able to infer that a takeover of VW was in progress, and that some entity (likely Porsche) was attempting to acquire control of the VW Shares using option contracts with counterparties. This District has recently recognized the deceptive nature of intentional efforts to parcel out trades to evade the need for a counterparty to disclose shares it held as hedges.[15]

52.     Gaube admitted Porsche's strategy of dividing up its option contracts among numerous counterparties when he stated in a call with a New York investment manager that Porsche did not want to "put all eggs in one basket" because that made it "easier for [Porsche] to not be visible, not be too visible in the market." In the same conversation, Gaube denied that the reason Porsche was dividing its options trades was concerns with counterparty risk, the only other plausible explanation for spreading around option contracts among counterparties.[16]

53.     In addition, Porsche manipulatively used option contracts to disguise its ability to finance its domination scheme. Viking and other investors in the market did extensive research regarding Porsche's financial condition to determine if it was feasible for Porsche to attempt to acquire control of VW. Based on the information available to it, Viking did not believe that Porsche had the financial capability to attempt to acquire control of VW, especially at the then-

---

[15] *CSX Corp. v. The Children's Investment Fund Mgmt., (UK) LLP,* 526 F. Supp. 2d 511 (S.D.N.Y.), *aff'd,* 292 Fed. Appx. 133 (2d Cir. 2008).

[16] The New York investment manager believed that Gaube was referring only to option contracts through which Porsche would acquire 50% of the VW Shares, since Gaube expressly denied in that same conversation that Porsche was attempting 75% ownership.

current prices of VW Shares. Unbeknownst to Viking and the market, however, Porsche was selling put options on VW Shares on such a large scale that it was able to use the proceeds from those sales to purchase an amount of call options on the same underlying VW Shares that would otherwise not have been financially feasible. As long as the value of the VW Shares remained above the "strike" price of Porsche's put options, Porsche was able to obtain the funds necessary to implement its fraudulent domination scheme. These put options enabled Porsche to manipulate the market by raising funds that could not be traced in Porsche's publicly available financial statements, thus allowing Porsche to pursue a goal that Viking and the market did not believe was financially possible based on the information available to them at that time. The put options also meant that if the price of VW Shares started falling naturally, then Porsche either had to trigger a short squeeze to artificially inflate the price of VW Shares or risk massive losses under the put option contracts.

## G.    Viking and the Market Rely on Porsche's Fraudulent Statements and Manipulative Acts

54.    Porsche's intentional misrepresentations and manipulative acts induced Viking to enter short positions in VW Shares, and had an effect on the price at which Viking entered into those positions.

55.    Viking believed that the market for VW Shares was an efficient market that promptly reflected publicly available information in the market price of the VW Shares. Viking was relying on the integrity of the market to provide an honest price for the VW Shares when it concluded that the VW Share price would likely decrease in the future based on its own analysis of the fundamentals of VW as a company. What Viking was not aware of, however, was that the market price for the VW Shares did not accurately reflect the natural interplay between supply and demand because it was built upon Porsche's fraud and manipulation. VW Shares were

trading in the market at prices that did not reflect Porsche's concealed demand for additional VW Shares and the risk of a massive short squeeze.

56.     Viking relied on the market to provide an honest price on VW Shares, and believed that the natural interplay of supply and demand was determining the then-current prices of VW Shares.  In fact, however, Porsche's fraud and manipulation had skewed both the supply and demand for the VW Shares.  The demand for the VW Shares was in actuality greater than market prices indicated, because Porsche concealed its efforts to corner the market in the VW Shares.  At the same time, the supply of the VW Shares was in actuality less than market prices indicated, because Porsche's fraud and manipulation hid the extent to which it had cornered the market in the free float of the VW Shares.  Porsche's fraud and manipulation had the effect of keeping the market price of the VW Shares lower than it would have been had the truth been available to the market that a party was attempting domination of VW.  If the market had been aware that Porsche intended to take control of VW, the market would have realized that actual demand for the VW Shares was much higher than it appeared and that the risk in shorting VW Shares was also much higher than it appeared.  Viking would not have entered short positions in VW Shares had it realized that the market price of VW Shares did not accurately reflect the natural interplay of supply and demand for the VW Shares.

57.     In addition to reliance on the market to provide an honest price, Viking also directly relied on (1) Porsche's repeated false public statements and material omissions regarding its intentions with regard to the ownership of VW Shares; and (2) the absence of any disclosure regarding the true extent of Porsche's direct or indirect control over VW Shares.  For example, on September 19, 2008, Bloomberg reported that Porsche made a September 18, 2008 statement that acquiring more than a simple majority of the VW Shares is "not under consideration."  This

statement was demonstrably false since Porsche already intended to take over VW and controlled more than a majority share of the VW Shares through undisclosed option contracts. Porsche issued various other corporate statements and press releases that contained the same false information and omissions, which were translated into English and emailed into the United States.

58.    In addition to its public statements, Porsche also made false statements directly to investors and investment management firms, including Gaube's statements to Viking Global Investors' Andrew Immerman. Those statements not only corroborate Porsche's bad intent with respect to its false public statements and manipulative omissions, but also demonstrates that Porsche also placed additional false information in the marketplace that distorted the market's ability to reach an honest price.

59.    Porsche's false and misleading statements were material to a reasonable investor, including Viking. Viking at all relevant times took into account the statements that Porsche made about its plans with respect to VW and its ownership of VW Shares. Viking would not have entered into short positions in VW Shares had it known of Porsche's plans to acquire 75% of VW.

60.    As a professional investor, Viking was aware that if Porsche entered option contracts for large amounts of VW Shares, the counterparties to those contracts would hedge the contracts by purchasing VW Shares. If the option contracts required the counterparties to hold more than a certain amount of VW Shares, the counterparty would be required to disclose its holdings of those VW Shares. Viking researched the disclosure of counterparty purchases (or lack thereof) with respect to VW Shares, and was aware that no counterparties had disclosed

large holdings of VW Shares.  Viking directly relied on this lack of reported holdings of VW

Shares by counterparties when it entered into and maintained its short positions in VW Shares.

**H.      Porsche Initiates the Short Squeeze of Historic Proportions**

61.      As a result of Porsche's fraud and manipulation, by October 26, 2008 almost

nobody owned VW Shares except for Porsche, Lower Saxony, index-tracking funds that were

required to hold the VW Shares to mimic indices, and Porsche's counterparties that were holding

VW Shares to hedge the call options they sold to Porsche.  Porsche had misled the market

(including Viking) into believing that a large free float of VW Shares was available, when in

reality virtually no float existed.  On October 26, 2008, the date Porsche initiated the short

squeeze by finally disclosing Porsche's secret holdings of VW Shares, the percentage of VW

Shares that had been sold short (or the "short interest"), was about 13%.  Because Porsche had

secretly acquired control of 74.1% of the Shares and Lower Saxony held another 20% of the

Shares, only 5.9% of the VW Shares remained available to short sellers to cover their

obligations.  Moreover, investors that would not or could not sell their Shares, including index

funds, held a significant amount of the remaining 5.9%.  In sum, when the market opened on

October 27, 2008 after Porsche's surprise announcement, less than a 5.9% free float was

available to satisfy a 13% short interest in VW Shares.  A massive short squeeze was inevitable.

62.      Porsche's decision to trigger the short squeeze in October 2008 was not

accidental.  Porsche desperately needed the short squeeze, and the spike in the price of VW

Shares that it caused, to remain solvent.  Porsche faced tremendous financial danger if the price

of VW Shares dropped below a certain point, and the price of VW Shares had been declining in

the week leading up to Porsche's announcement.

63.      Porsche faced danger from a drop in the value of VW Shares because it had

acquired control over virtually the entire free float of VW Shares by entering into call option

contracts.  Call options cost money, and Porsche needed a means of financing its purchases.
Porsche paid for its call options by selling put options on the same underlying VW Shares.  Put
options obligated Porsche to pay its put option counterparties the difference between the "strike"
price of the put option and the actual price of VW Shares if the put strike price was higher than
the actual price of the VW Shares.  In general, if the price of VW Shares dropped below the put
strike price, then Porsche had a liability to its counterparties for that difference, and as the VW
Shares fell, that liability increased.  In sum, Porsche sold put options – which obligated it to pay
money if the price of VW Shares declined – in exchange for call options by which Porsche
accumulated control of VW Shares if the price increased. A rising price on VW Shares increased
the value of Porsche's call options (what counterparties owed Porsche) and reduced Porsche's
liabilities on the value of its put options (what Porsche owed counterparties).

      64.     This strategy worked as long as the price of VW Shares continued to increase.
From early 2008 through mid-October 2008, the price of VW Shares rose and Porsche's plan
worked smoothly.  On March 3, 2008, VW Shares closed at just under $228.  On August 8, 2008,
VW Shares closed at just over $300.  The average closing price of VW Shares from October 1,
2008 through October 17, 2008 (a Friday), was $437.

      65.     But, on Monday, October 20, 2008, as the world's stock markets plummeted,
Porsche's strategy began to fall apart.  VW Shares closed at $368 that day, more than 22% below
their close the previous Friday.  By the end of that week, the closing price of VW Shares had
fallen to just under $266, or 39% below the average closing price of $437 from October 1, 2008
through October 17, 2008.  Porsche's increasing liability on its put options threatened to
overwhelm the falling value of Porsche's call options.  If the prices of VW Shares continued to
drop, Porsche's solvency was in jeopardy.

66.     On October 26, 2008, a Sunday, in a press release titled "Porsche Heads for Domination Agreement," Porsche revealed its true control of VW Shares: "[a]t the end of last week, Porsche SE held 42.6 percent of the Volkswagen ordinary shares and in addition 31.5 percent in so-called cash settled options relating to Volkswagen ordinary shares to hedge against price risks, representing a total of 74.1 percent." This was the first time that Porsche had ever disclosed the true extent of Porsche's combined direct holdings and contractual rights to acquire VW Shares. Porsche's representation that it held a 74.1% interest in VW confirms that Porsche and its counterparties viewed its option contracts as giving it control of the VW Shares underlying the options. Porsche further admitted that it aimed "to increase [its VW stake] to 75% in 2009, paving the way to a domination agreement." Porsche's statement that its disclosure of its VW position "should give so called short sellers… the opportunity to settle their relevant positions without rush and without facing major risks" was a mockery of what Porsche must have known would come when the markets opened the next day.

67.     On Monday, October 27, 2008, the day following Porsche's announcement, when the markets opened "all hell broke loose":

> When financial markets opened Monday, October 27, all hell broke loose. Funds that had borrowed VW shares and sold them, expecting no takeover offer and betting the stock would decline, raced to purchase shares to unwind the bets. There weren't enough to go around. Part of the reason is that underwriters of cash-settled options typically hedge their risk by owning the shares of the company involved. The shares they owned, combined with those Porsche had acquired, added up to 74.1%, and Lower Saxony state owned 20.1%. The result was that while some 12.8% of VW shares were on loan, mostly to short sellers, those that for practical purposes were in circulation amounted to only 6% of VW shares. As hedge funds fought for the remaining VW shares they drove the stock's price ever higher – deepening their losses. At the height of the short squeeze on Oct. 28, VW stock briefly topped 1,000 Euros, nearly five times as high as on Oct. 24, making VW the biggest company by stock-market value for a few hours.

Mike Esterl and Edward Taylor, "As Giant Rivals Stall, Porsche Engineers a Financial Windfall," *Wall Street Journal*, A1, November 8, 2008.

68.     On Monday, October 27, 2008, VW Shares opened at $437 per Share, up 66% from the close on Friday, October 24, 2008. During the week of October 27-31, 2008, VW Shares traded between a low of $406 (54% above the close on Friday, October 24, 2008) to a high of $1,276 (477% above the close on Friday, October 24, 2008). For a time, VW was the most valuable corporation on the planet by market capitalization. Parties that had sold VW Shares short, or entered into the short side of security-based swaps on VW Shares, were forced to cover their positions at prices that spiraled higher and higher.

69.     The following chart represents the closing price of VW Shares from March through November, 2008, demonstrating the dramatic effect that the short squeeze had on the price of the VW Shares:



70.     At the height of the short squeeze, on October 29, 2008 Porsche agreed (albeit under substantial pressure) to release up to 5% of the VW Shares that it directly or indirectly controlled, such that it could take advantage of the price parties were being forced to pay for the VW Shares but still maintain the bulk of its position in VW Shares for the takeover of VW. Because of the outrageously high price of VW Shares at the time, Porsche acquired billions for the VW Shares it released.  While "profiting" from its fraud and market manipulation, a Porsche representative mocked the victims of its scheme, saying, "A couple of gamblers on the market got their odds wrong.  And now they are pointing a finger at us."  During this period Porsche also reduced its exposure to the put options it had sold.

71.     Around the same time, the German stock market index (DAX) reduced VW's weighting in its index thus allowing index funds to sell VW Shares so that some shorts were able

to cover, but this was not before short sellers, and parties that had entered the short side of security-based swap transactions on VW Shares, lost an estimated $38.1 billion in less than a week and Porsche received a windfall of $7.6 billion.

72.     After Porsche sold 5% of its position for mammoth profits, it used the cash to purchase more VW Shares and on January 5, 2009, officially became the parent entity of VW by virtue of its majority interest.  Porsche, however, had pushed its finances to the breaking point to attain this position, and even with the massive profits it "earned" through its fraudulent scheme amassed more than €10 billion in net debt.  With the VW Share price falling, the credit markets frozen, and Porsche's need to roll over its short-term debt, VW extended Porsche an emergency loan and opened the door for a reverse takeover.

73.     As of mid-October 2010, VW is trading at around $115.  Now that the VW Shares have fallen back to levels last seen in 2007, the short sellers' assessment of the value of the VW Shares compared to the fundamentals of the company has proven correct.  Furthermore, German market regulators have been investigating Porsche's market manipulation.  Wiedeking and Haerter have not only lost their positions at Porsche but are currently the subject of a massive insider trading criminal inquiry spearheaded by Frankfurt and Stuttgart prosecutors, and have had their homes and offices raided.  All of this is of little solace for Viking, however, which lost at least $390 million terminating and/or hedging its short positions in the two days following Porsche's surprise announcement.

### THE REACH OF SECTION 10(b) OF THE EXCHANGE ACT

74.     The Supreme Court recently ruled in *Morrison v. National Australia Bank Ltd.,* No. 08-1191 (June 24, 2010) that Section 10(b) of the Exchange Act applies to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities." *Id.* at 18. In deciding the case, the Court specifically noted that the transactions at issue in the case were

entered into by foreign plaintiffs, and that the claims of the only named American plaintiff to the case were not before it. *Id.* at n.1 ("...an American investor in [Respondent's] ADRs also brought suit, but his claims were dismissed by the District Court ...Petitioners did not appeal that decision ... and it is not before us.").

75.     Each of the Viking transactions was entered into and terminated or hedged in the United States, and falls squarely within the "domestic transactions in other securities" category. Viking Global Equities LP and Viking Global Equities II LP are onshore entities established under the laws of Delaware.  The investment decisions for these funds are handled entirely by Viking Global Investors in its New York offices, and their investments are entered into and terminated domestically in the United States.  VGE III Portfolio Ltd. is an offshore corporation established under the laws of the Cayman Islands whose investment decisions are delegated contractually to Viking Global Investors, which maintains offices in New York.  VGE III Portfolio Ltd.'s investments are thus entered into and terminated domestically in the United States.

76.     Moreover, VW Shares are traded in the United States through Volkswagen's sponsored American Depositary Receipt ("ADR") facilities.  An ADR represents ownership in the shares of a non-U.S. company, and is issued by a U.S. depository bank.  An ADR can represent a fraction of a share, a single share, or multiple shares of the foreign stock, and generally tracks the price of the foreign stock in its home market, adjusted for the ratio of ADRs to foreign company shares.  An owner of an ADR has the right to obtain the foreign stock it represents.  At all relevant times, VW had (and still has) two sponsored ADR programs, representing ordinary and preference shares that are backed by J.P. Morgan and trade in the U.S.

on the over-the-counter market.[17]  Transactions in VW's ADRs are "domestic transactions in other securities," and as such are covered by Section 10b of the Exchange Act pursuant to *Morrison*. *Id.*  Porsche's fraud and manipulation directly affected transactions in VW ADRs.[18]

## CAUSES OF ACTION

### COUNT I
### SECURITIES FRAUD BASED ON FALSE AND MISLEADING STATEMENTS IN VIOLATION OF § 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 (BY PLAINTIFFS VIKING GLOBAL EQUITIES LP AND VIKING GLOBAL EQUITIES II LP)

77.    Plaintiffs repeat and reallege each and every allegation set forth above as if set forth in full herein.

78.    Porsche carried out a plan, scheme and course of conduct which was intended and did (i) deceive Viking and other investors, as alleged herein; and (ii) caused Viking and other investors to enter short positions in VW Shares (or enter into the short side of security-based swaps on VW Shares) from at least March 3, 2008 through October 24, 2008, and to buy VW Shares or otherwise hedge their short positions (or terminate security-based swaps on VW Shares) at artificially high prices from October 27, 2008 through at least October 31, 2008.

79.    In furtherance of this unlawful scheme, plan, and course of conduct, Porsche took the actions set forth herein.

80.    Porsche (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements

---

[17]  *See* http://www.sec.gov/answers/adrs.htm.

[18]  *But see, e.g. Cornwell v. Credit Suisse Group*, No. 08 3758, 2010 WL 3069597 (S.D.N.Y. July 27, 2010);  *Sglambo v. McKenzie*, No. 09 Civ. 10087, 2010 WL 3119349 (S.D.N.Y. Aug. 6, 2010);  *Cedeno v. Cedel Int'l Inv. Ltd*, No. 09 Civ. 9716, 2010 U.S. Dist. Lexis 88026 (S.D.N.Y. Aug. 24, 2010);  *In re Alstom SA Securities Litigation*, 2010 WL 3718863 (S.D.N.Y. Sept. 14, 2010).  The Second Circuit has not issued any decisions regarding the reach of federal securities laws under *Morrison*.

made not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the buyers and sellers of VW Shares and security-based swaps on those Shares in violation of §10(b) of the Exchange Act and Rule 10b-5.

81.     Porsche, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal their true intentions with respect to acquiring 75% of the VW Shares and the contracts they put in place to do so.

82.     Porsche employed devices, schemes and artifices to defraud and engaged in acts, practices, and a course of conduct as alleged herein in an effort from at least March 3, 2008 through October 24, 2008 to assure Viking and other investors that Porsche had no intention of acquiring 75% of the VW Shares.  This included Porsche making, or participating in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make Porsche's statements about its intentions with respect to the acquisition of VW Shares not misleading in light of the circumstances under which they were made, as set forth more particularly herein.  This also included Porsche engaging in transactions, practices, and a course of business that operated as a fraud and deceit upon the buyers and sellers of VW Shares (or the buyers or sellers of VW security-based swaps), including Viking, from at least March 3, 2008 through October 24, 2008.

83.     Porsche's false and misleading statements are alleged in Section E above.

84.     Porsche had actual knowledge of the misrepresentations and omissions of material facts alleged herein.

85.     Porsche made its material misrepresentations and/or omissions knowingly and for the purpose and effect of concealing its true intentions with respect to the acquisition of the VW Shares.

86.     As a result of the dissemination of the materially false and misleading information and the failure to disclose material facts, alleged above, the market price of VW Shares was artificially depressed from at least March 3, 2008 through October 24, 2008, and artificially inflated from October 27, 2008, through at least October 31, 2008.

87.     Porsche's misrepresentations and omissions caused Viking's losses.  Porsche's fraud caused Viking's losses because Viking relied on the market for VW Shares being free of fraud when they entered into short positions on VW Shares.  Unaware that the market price of the VW Shares was artificially depressed from at least March 3, 2008 through October 24, 2008, and relying upon (i) the false and misleading statements and omissions made by Porsche during that same period as described herein, and (ii) the integrity of the market in which VW Shares trade, Viking entered short positions on VW Shares at prices lower than would have existed had all of the facts been made public, and subsequently terminated or hedged these short positions on VW Shares at artificially high prices from October 27, 2008, through at least October 31, 2008.

88.     At the time of the Defendant's misrepresentations and omissions, Viking was not aware of their falsity, and believed them to be true.  Viking was a professional investor and at all relevant times it took into account, as any reasonable investor would have, statements that Porsche made about its plans with respect to VW and its ownership of VW Shares.  It reviewed press reports and analyst reports regarding Porsche's holdings of VW Shares, and considered those reports for their relevance to each of its investment decisions.  Had Viking known the truth regarding Porsche's true intentions with respect to the acquisition of VW Shares or the true

extent of Porsche's actual control of VW Shares, Viking would not have entered short positions in VW Shares.

89.     The market for VW Shares was, at all times, an efficient market that promptly digested current information with respect to VW from publicly available sources and reflected such information in the prices of VW Shares and associated security-based swaps.  VW's Shares were traded on a number of stock exchanges in Europe, and in the United States through VW's sponsored ADR facility.  VW Shares were included in major market indices including the DAX. Security analysts followed VW and published research reports regarding VW that were publicly available to investors.  The market price of VW Shares and associated security-based swaps reacted promptly to the dissemination of public information regarding VW.

90.     As a result of Porsche's misconduct alleged herein, the market for VW Shares and associated security-based swaps was artificially depressed from at least March 3, 2008 through October 24, 2008, and artificially inflated from October 27, 2008 through at least October 31, 2008.

91.     The "fraud-on-the-market" theory applies.  Viking justifiably relied on the integrity of the market price for VW Shares and was substantially damaged as a direct and proximate result of its entry into short positions in VW Shares at artificially depressed prices and its subsequent termination or hedging of those positions at artificially high prices when the truth was disclosed.

92.     By virtue of the foregoing, Defendant has violated § 10(b) of the Exchange Act and Rule 10b-5.

93.     As a direct and proximate result of Defendant's wrongful conduct, Viking suffered damages in connection with its entry into short positions in VW Shares from at least

March 3, 2008 through October 24, 2008, and its subsequent termination or hedging of those

positions at artificially high prices from October 27, 2008, through at least October 31, 2008.

## COUNT II
### MARKET MANIPULATION IN VIOLATION OF § 10(b) OF THE EXCHANGE ACT AND RULE 10b-5
### (BY PLAINTIFFS VIKING GLOBAL EQUITIES LP AND VIKING GLOBAL EQUITIES II LP)

94.     Plaintiffs repeat and reallege each and every allegation set forth above as if set

forth in full herein.

95.     Porsche, directly and indirectly, by the use, means or instrumentalities of

interstate commerce and/or of the mails, engaged in manipulative acts from at least March 3,

2008 through October 24, 2008 that kept the price of VW's Shares lower than it would have been

had all of the facts been made public, and then drove the price of VW's Shares to artificially high

levels on and after October 27, 2008, through at least October 31, 2008, resulting in a short

squeeze.

96.     Porsche's market manipulation caused Viking's losses.  Porsche's manipulative

acts caused Viking's losses because Viking relied on the market for VW Shares being free of

manipulation.  Porsche's market manipulation induced Viking to enter into short positions in

VW Shares from March 3, 2008 through October 24, 2008 at prices lower than would have

existed if all of the facts regarding Porsche's intentions and holdings with respect to VW Shares

had been made public.  Defendant's market manipulation caused Viking to terminate and or

hedge its short positions in VW Shares at artificially high prices on and after October 27, 2008

through at least October 31, 2008.

97.     At the time of Defendant's manipulation, Viking was ignorant of Defendant's

manipulative acts.  Had Viking known the truth regarding Porsche's true intentions to take

control of VW through the acquisition of 75% of the VW Shares and Porsche's concealment of

physical options contracts as cash-settled options contracts, or had Viking known that Defendant was secretly acquiring additional VW Shares through deceptive distribution of option contracts designed to evade the triggering of counterparty disclosure requirements, Viking would not have entered short positions in VW Shares.  Viking is a professional investor, and at all relevant times it and its investment manager took into account that no counterparty disclosed the acquisition of a significant amount of VW Shares.

98.    The market for VW Shares was, at all times, an efficient market that promptly digested current information with respect to VW from publicly available sources and reflected such information in the prices of VW Shares and associated security-based swaps.  VW's Shares were traded on a number of stock exchanges in Europe, and in the United States through VW's sponsored ADR facility.  VW Shares were included in major market indices including the DAX. Security analysts followed VW and published research reports regarding VW that were publicly available to investors.  The market price of VW Shares and associated security-based swaps reacted promptly to the dissemination of public information regarding VW.

99.    As a result of the Defendant's misconduct alleged herein, the market for VW Shares and associated security-based swaps was artificially depressed from at least March 3, 2008 through October 24, 2008, and artificially inflated from October 27, 2008 through at least October 31, 2008.

100.    The "fraud-on-the-market" theory applies.  Viking justifiably relied on the integrity of the market price for VW Shares and was substantially damaged as a direct and proximate result of its entry into short positions in VW Shares at artificially depressed prices and its subsequent termination or hedging of those positions at artificially high prices when the truth was disclosed.

101.    Porsche had actual knowledge of the manipulation of the market contained herein, and intended to deceive Viking and other investors and hide the extent of Porsche's control of additional VW Shares through concealment of physical options contracts as cash-settled options contracts and deceptive distribution of option contracts designed to evade the triggering of counterparty disclosure requirements.  Porsche engaged in its deceptive conduct knowingly and for the purpose and effect of concealing its true intentions with respect to the acquisition of VW Shares.

102.    By virtue of the foregoing, Defendant has violated §10(b) of the Exchange Act and Rule 10b-5.

103.    As a direct and proximate result of Defendant's wrongful conduct, Viking suffered damages in connection with its entry into short positions in VW Shares from March 3, 2008 through October 24, 2008, and its subsequent termination or hedging of those positions at artificially high prices from October 27, 2008 through at least October 31, 2008.

## COUNT III
## COMMON-LAW FRAUD
### (BY ALL PLAINTIFFS)

104.    Plaintiffs repeat and reallege each and every allegation set forth above as if set forth in full herein.

105.    Porsche made material misrepresentations and material omissions of fact which were false and which Porsche knew to be false.

106.    Porsche made material misrepresentations and material omissions of fact for the purpose of inducing Viking and other investors to rely upon them.

107.    Viking justifiably and reasonably relied on the Defendant's material misrepresentations and material omissions of fact.

108.    Viking was damaged in an amount to be proven at trial on account of its justifiable reliance on the Defendant's material misrepresentations and material omissions of fact.

### COUNT IV
### UNJUST ENRICHMENT
### (BY ALL PLAINTIFFS)

109.    Plaintiffs repeat and reallege each and every allegation set forth above as if set forth in full herein.

110.    Through fraud, market manipulation, and other unlawful and improper conduct, Porsche implemented a scheme whereby Porsche extracted billions of dollars in trading profits in less than one week at the expense of investors, including Viking, that lost an estimated $38.1 billion.  Porsche's unlawful and improper conduct has resulted in Porsche being unfairly and unjustly enriched at Viking's expense.

111.    As a direct and proximate result of Porsche's unlawful and improper conduct, as set forth above, Porsche has been and will continue to be unjustly enriched at Viking's expense, and Viking has suffered and will continue to suffer damages in an amount to be proven at trial. Equity and good conscience demand an award of damages equivalent to the damages that Viking has suffered and will continue to suffer as a result of Porsche's unjust enrichment at Viking's expense.

### JURY TRIAL DEMAND

112.    Plaintiffs hereby demand a jury trial for each of the counts alleged.

### PRAYER FOR RELIEF

113.    WHEREFORE, Plaintiffs pray for relief and judgment in its favor, as follows:

      a.      On Count I damages in an amount to be proven at trial;

      b.      On Count II damages in an amount to be proven at trial;

    c.       On Count III damages in an amount to be proven at trial;

    d.       On Count III damages in an amount to be proven at trial;

    e.       Plaintiffs' reasonable costs and expenses incurred in this action, including fees for Plaintiffs' attorneys and experts;

    f.       Prejudgment interest and/or opportunity cost damages in favor of Plaintiffs; and

    g.       Such other and further relief as this Court may deem just and proper.


DATED:   New York, New York
           October 22, 2010

QUINN EMANUEL URQUHART &
SULLIVAN LLP


By: _____
   Rick I. Werder
     rickwerder@quinnemanuel.com
   Marc L. Greenwald
     marcgreenwald@quinnemanuel.com
   Elinor C. Sutton
     elinorsutton@quinnemanuel.com

51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
(212) 849-7000

*Attorneys for Plaintiffs*

*Of Counsel for Plaintiffs*
(pending admission *pro hac vice*)

DOWD BENNETT LLP

   James F. Bennett
     jbennett@dowdbennett.com
   Megan S. Heinsz
     mheinsz@dowdbennett.com

7733 Forsyth Blvd., Suite 1410
St. Louis, Missouri 63105
(314) 889-7302